**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| BRANDON THOMAS BAKER, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CIVIL ACTION NO. 19-00420-B |
| | * | |
| ANDREW M. SAUL, | * | |
| Commissioner of Social | * | |
| Security, | * | |
| | * | |
| Defendant. | * | |

<u>**ORDER**</u>

Plaintiff Brandon Thomas Baker (hereinafter "Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security denying his claim for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq*. On May 22, 2020, the parties consented to have the undersigned Magistrate Judge conduct any and all proceedings in this case. (Doc. 17). Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (Doc. 19). Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

I.  **Procedural History**[1]

Plaintiff protectively filed his application for benefits on August 19, 2015, alleging disability beginning April 21, 2015, based on seizures and a back injury. (Doc. 11 at 111, 168, 172). Plaintiff's application was denied at the initial stage and on reconsideration. (Id. at 118, 127). Upon timely request, Plaintiff was granted an administrative hearing before Administrative Law Judge James S. Elkins (hereinafter "ALJ") on December 19, 2017. (Id. at 47, 70, 131). Plaintiff attended the hearing with his counsel and provided testimony related to his claims. (Id. at 70-98). A vocational expert (hereinafter "VE") also appeared at the hearing and provided testimony. (Id. at 99-102). On September 4, 2018, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled. (Id. at 14-26). The Appeals Council denied Plaintiff's request for review on June 12, 2019. (Id. at 5). Therefore, the ALJ's decision dated September 4, 2018 became the final decision of the Commissioner. (Id.).

Having exhausted his administrative remedies, Plaintiff timely filed the present civil action. (Doc. 1). Oral argument was conducted on June 16, 2020 (Doc. 20), and the parties agree that this case is now ripe for judicial review and is properly

---

[1] The Court's citations to the transcript in this order refer to the pagination assigned in CM/ECF.

before this Court pursuant to 42 U.S.C. § 405(g).

## II. Issue on Appeal

**Whether the ALJ erred in according little weight to the opinions of Plaintiff's treating neurologist?**

## III. Factual Background

Plaintiff was born on July 7, 1985 and was thirty-two years of age at the time of his administrative hearing on December 19, 2017. (Doc. 11 at 77, 154). Plaintiff completed high school and attended regular classes. (Id. at 79). His past work history includes jobs in maintenance and employment as a box picker, retail sales associate, oil drum cleaner, forklift operator, and dishwasher. (Id. at 80-81, 99, 189-95, 340). He last worked in 2016, after his alleged disability onset date, as a part-time house sitter at a small group home.[2] (Id. at 79-80).

Plaintiff reported that he first began to experience seizures in 2000 or 2001, and that he was stable for a number of years until being rear-ended in a car accident in 2015. (Id. at 81, 96-97, 179, 256). According to Plaintiff, as a result of the accident, he hurt his back and started having seizures. (Id. at 81, 256). Plaintiff testified that he is unable to work because he

---

[2] At the hearing, Plaintiff estimated that he worked thirty-two hours a week at the group home. (Doc. 11 at 80). At his February 2, 2016 visit to Singing River Health System's Neuroscience Center, Plaintiff reported "working long hours, 12 hour shift[s] at work." (Id. at 286).

experiences "staring off, small, spell-type seizures" that make him depressed and easily tired, cause memory loss, and negatively impact his concentration and comprehension.[3]   (Id. at 84, 86-87, 89, 96).   Plaintiff's seizures are treated with the medications Topiramate (Topamax) and Lamotrigine (Lamictal).   (Id. at 257).

Plaintiff has a driver's license and, in a function report completed on September 21, 2015, reported that he drives.[4]   (Id. at 77, 184).   With regard to daily activities, Plaintiff reported that he has no problems with personal care, and that he helps his children get ready for school and bed, cleans the house, does laundry, irons clothes, vacuums the floor, and washes dishes.   (Id. at 87-88, 181-83).   He also reported shopping with his wife, playing with his children, watching television and movies, playing video games, regularly attending church, and visiting with family and friends.   (Id. at 87-88, 181, 185).   Plaintiff further reported that he is able to conduct telephone conversations, follow written instructions, get along well with authority figures, pay bills,

---

[3] In a seizure questionnaire completed on September 21, 2015, Plaintiff stated that he had "small staring off seizures [at] least 2-3x wk[.]"   (Doc. 11 at 179).   He reported that the seizures last "[s]ometimes 3-5 minutes, but ha[ve] lasted for an hour sometimes" and that he feels "ok" after the spell is over most of the time, but sometimes has headaches after a seizure.   (Id. at 180).

[4] At the December 2017 hearing, Plaintiff testified that he had last driven a car "maybe four or five months ago, or longer[,]" and that his neurologist had recommended that he not drive.   (Doc. 11 at 78).

and count change.  (Id. at 184-87).

IV.  **Standard of Review**

    In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining (1) whether the decision of the Commissioner is supported by substantial evidence and (2) whether the correct legal standards were applied.[5]  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991).  "Substantial evidence is more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  In determining whether substantial evidence exists, a reviewing court must consider the record as a whole, taking into account evidence both favorable and unfavorable to the Commissioner's decision.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam); Short v. Apfel, 1999 U.S. Dist. LEXIS

---

[5] This Court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

10163, at *4 (S.D. Ala. June 14, 1999).

**V.   Statutory and Regulatory Framework**

An individual who applies for Social Security disability
benefits must prove his or her disability.   20 C.F.R. § 404.1512.
Disability is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to last
for a continuous period of not less than 12 months[.]"   42 U.S.C.
§ 423(d)(1)(A); see also 20 C.F.R. § 404.1505(a).   The Social
Security regulations provide a five-step sequential evaluation
process for determining whether a claimant has proven his or her
disability.   See 20 C.F.R. § 404.1520.

The claimant must first prove that he or she is not engaged
in substantial gainful activity.   Carpenter v. Comm'r of Soc. Sec.,
614 F. App'x 482, 486 (11th Cir. 2015) (per curiam).[6]   The second
step requires the claimant to prove that he or she has a severe
impairment or combination of impairments.   Id.   If, at the third
step, the claimant proves that the impairment or combination of
impairments meets or equals a listed impairment, then the claimant

---

[6] Federal Appendix cases are unpublished Eleventh Circuit opinions
and are not considered binding precedent, but they may be cited as
persuasive authority.   11th Cir. R. 36-2; Henry v. Comm'r of Soc.
Sec., 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases
printed in the Federal Appendix are cited as persuasive
authority.").

is automatically found disabled regardless of age, education, or work experience. Id. If the claimant cannot prevail at the third step, the ALJ must determine the claimant's residual functional capacity ("RFC") before proceeding to step four. Id. A claimant's RFC is an assessment, based on all relevant medical and other evidence, of a claimant's remaining ability to work despite his or her impairments. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

Once a claimant's RFC is determined, the evaluation proceeds to the fourth step, where the claimant must prove an inability to perform his or her past relevant work. Carpenter, 614 F. App'x at 486. If a claimant meets his or her burden at the fourth step, it then becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's RFC, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985) (per curiam). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the burden then shifts back to the claimant to prove his or her inability to perform those jobs in order to be found disabled. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

## VI.  **The ALJ's Findings**

In the case *sub judice*, the ALJ observed that Plaintiff worked after his alleged disability onset date of April 21, 2015. (Doc. 11 at 16).   The ALJ assumed, without deciding, that Plaintiff's work did not constitute substantial gainful activity and proceeded to the next step of the sequential evaluation.  (Id.).   At step two, the ALJ found that Plaintiff has the severe impairments of seizure disorder and specific learning disorder.  (Id.).   The ALJ also found that Plaintiff's impairments, when considered individually and in combination, do not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  (Id. at 17).   The ALJ further found that Plaintiff has the RFC to perform a full range of work at all exertional levels with the following non-exertional limitations: he can never climb ladders, ropes, or scaffolds; he can occasionally balance; he cannot have exposure to unprotected heights or moving machinery; and he can perform only simple, routine, repetitive tasks.  (Id. at 19).   The ALJ found that Plaintiff is unable to perform his past relevant work as a janitor, stock picker, sales associate, oil drum cleaner, or forklift operator.  (Id. at 24).   Based upon the testimony of the VE, the ALJ found that Plaintiff can perform other jobs that exist in significant numbers in the national economy, such as booth cashier, housekeeping/cleaner, and photocopy machine operator.

(Id. at 25).  Thus, the ALJ found that Plaintiff is not disabled. (Id. at 25-26).

## VII. **Discussion**

> **Substantial evidence supports the ALJ's assignment of little weight to the opinions of Plaintiff's treating neurologist.**

Plaintiff's sole claim on appeal is that the ALJ's decision is not supported by substantial evidence because the ALJ erred in giving little weight to the opinions of his treating neurologist, Lennon E. Bowen, IV, M.D.  (Doc. 12 at 2-6).  The Commissioner counters that the ALJ extensively evaluated Plaintiff's seizure disorder in developing his RFC and properly discounted Dr. Bowen's opinions.  (Doc. 13 at 4).  Having carefully reviewed the record in this case, the Court finds that Plaintiff's claim is without merit.

As part of the disability determination process, the ALJ is tasked with weighing the opinions and findings of treating, examining, and non-examining physicians.  In reaching a decision, the ALJ must specify the weight given to different medical opinions and the reasons for doing so.  See Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011).  The failure to do so is reversible error.  See Williams v. Astrue, 2009 U.S. Dist. LEXIS 12010, at *4, 2009 WL 413541, at *1 (M.D. Fla. Feb. 18, 2009).

The ALJ must give "substantial weight" to the opinion of a claimant's treating physician, unless "good cause" exists for not

doing so.  Costigan v. Comm'r, Soc. Sec. Admin., 603 F. App'x 783, 788 (11th Cir. 2015) (per curiam) (citing Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004) (per curiam)). "The opinion of a one-time examining physician" is not entitled to the same deference as that of a treating physician.  Petty v. Astrue, 2010 U.S. Dist. LEXIS 24516, at *50, 2010 WL 989605, at *14 (N.D. Fla. Feb. 18, 2010) (citing Crawford, 363 F.3d at 1160). Also, an "ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.'" Milner v. Barnhart, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam) (citing 20 C.F.R. § 404.1527(f)(2)(i)).  "The ALJ may rely on opinions of non-examining sources when they do not conflict with those of examining sources." Milner, 275 F. App'x at 948 (citing Edwards v. Sullivan, 937 F.2d 580, 584-85 (11th Cir. 1991)).

Whether considering the opinions of treating, examining, or non-examining physicians, good cause to discredit the testimony of any medical source exists when it is contrary to or unsupported by the evidence of record.  Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004).  "Good cause may also exist where a doctor's opinions are merely conclusory, inconsistent with the doctor's medical records, or unsupported by objective medical evidence." Hogan v. Astrue, 2012 U.S. Dist. LEXIS 108512, at *8, 2012 WL

3155570, at *3 (M.D. Ala. Aug. 3, 2012).  The ALJ is "free to
reject the opinion of any physician when the evidence supports a
contrary conclusion." Sryock, 764 F.2d at 835 (citation omitted);
see also Adamo v. Comm'r of Soc. Sec., 365 F. App'x 209, 212 (11th
Cir. 2010) (per curiam) ("The ALJ may reject any medical opinion
if the evidence supports a contrary finding.").

The record reflects that Dr. Bowen began treating Plaintiff
for seizures beginning in 2006, and that Plaintiff's last treatment
with Dr. Bowen *prior* to his alleged disability onset date was in
2013.  (See id. at 263, 295).  Four days after an April 16, 2015
car accident, Plaintiff was seen by Terry W. Taylor, M.D., an
occupational medicine specialist, with complaints of lower back
and tailbone pain and erectile dysfunction.  (Id. at 256).  Dr.
Taylor noted that Plaintiff's medications included Topamax and
Lamictal, in addition to Tylenol and Flexeril, which were
prescribed by a clinic immediately after the car accident.  (Id.
at 256-57).  On examination, Dr. Taylor noted lumbar pain, normal
range of motion, negative straight leg raising sign, normal
reflexes, healthy appearance, and minimal difficulty with
movement.  (Id. at 257).  Dr. Taylor recommended that Plaintiff
return to regular duty, effective that day.  (Id.).

During a return visit on April 28, 2015, Dr. Taylor again
noted lumbar pain, no spasm, normal sensation, negative straight
leg raising sign, normal range of motion, intact cranial nerve

function, normal light touch sensation, no difficulty moving, and orientation to person, place, and time. (Id. at 255). Dr. Taylor reiterated that Plaintiff could perform his job without restriction and discharged him from care. (Id.).

On May 7, 2015, Plaintiff presented to Singing River Health System's Neuroscience Center ("Singing River"), where he was seen by a physician assistant. (Id. at 295). He reported that he had suffered his first seizure in years while talking to his wife on the phone the previous day. (Id.). Plaintiff stated that he went to the emergency department after the seizure, and his Lamictal was increased to 100 milligrams twice a day. (Id.). Plaintiff's physical and neurological examinations were normal, and he was advised not to drive until he had been free of seizures for at least six months. (Id. at 295-96).

Plaintiff returned to Singing River on May 27, 2015, where he was seen by Dr. Bowen. (Id. at 292). Plaintiff's physical and neurological examinations remained normal. (Id. at 292-93). Dr. Bowen noted that Plaintiff's seizures were unchanged and involved "him staring off, mouth open and eyes closed." (Id. at 292). Plaintiff's Lamictal was increased to 150 milligrams twice daily, and Dr. Bowen advised him not to return to work until he was free of seizures. (Id. at 293).

Plaintiff followed up with Dr. Bowen on June 22, 2015 and reported that his seizures were much better since increasing his

dosage of Lamictal.  (Id. at 289).  He also reported that he had started physical therapy and felt better overall, but he relayed an episode where he bent over and felt a twinge in his back and then his eyes started jerking.  (Id.).  Dr. Bowen's physical and neurological examinations of Plaintiff were normal, and Plaintiff was advised to continue his current medication regimen.  (Id. at 289-90).

Dr. Bowen wrote a letter dated September 14, 2015, in which he stated that Plaintiff's seizures began in 2001 and that Plaintiff had been under his care since 2006.  (Id. at 263).  Dr. Bowen further stated:

> Despite multiple medication trials, he continues to have seizures.  His seizures are unpredictable, and frequent. Due to cognitive side effects of his antiseizure medications he may be forgetful, groggy, and unsteady on his feet.  Due to a combination of intractable seizures and side effects from his antiseizure medications he is unemployable.  I support his claim for full lifetime disability.

(Id.).

On November 16, 2015, Plaintiff presented to Robert L. Cobb, M.D. for a consultative medical examination.  (Id. at 271-72). Dr. Cobb noted: "[Plaintiff] says he had some increase in his nocturnal seizures following the rear-ending, and that his meds have been increased . . . that he is stabilized.  He says Dr. Bowen cleared him to drive and has no restrictions."  (Id. at 271).  On examination, Plaintiff was appropriate, alert, oriented, and in no

acute distress; he ambulated normally; he had normal deep tendon reflexes, no sensory changes in the lower extremities, and 5/5 strength; and his cranial nerves, motor functions, and cerebellar functions were intact. (Id. at 271-72). Dr. Cobb stated that "[b]y history and examination at this time," Plaintiff appeared to be doing better than he was when Dr. Taylor cleared him to return to regular duty work in April 2015. (Id. at 272). Dr. Cobb opined that Plaintiff was capable of being ambulatory for two hours at a time and seven hours out of an eight-hour period, capable of sitting for comparable periods, able to bend at the waist frequently and squat or kneel occasionally, and able to lift and carry ten to fifteen pounds frequently and twenty to thirty pounds occasionally. (Id.).

Plaintiff next returned to Singing River on February 2, 2016, and was seen by Karmen R. Clark, PA-C. (Id. at 286). On that date, Plaintiff reported that, over the past one-and-a-half weeks, "zoning out episodes ha[d] been occur[r]ing [one or two times] daily beginning with tingling in his leg, then his eye start twitching [sic], he zones out, and he feels drained afterwards. (Id.). It was noted that Plaintiff was "working long hours, 12 hour shift[s] at work." (Id.). Plaintiff also reported lower back pain and expressed his belief that the April 2015 "car accident has triggered the back pain which has caused increase in seizures." (Id.). Physical and neurological examinations of

Plaintiff yielded normal results. (Id. at 286-87). An EEG and a brain MRI were ordered, and Plaintiff's Lamictal was increased to 200 milligrams twice daily. (Id. at 287). Physician assistant Clark stated that it was "[d]oubtful that the back pain is related to seizure increase." (Id.).

Plaintiff underwent a brain MRI on February 19, 2016. (Id. at 284). It was unremarkable and demonstrated no intracranial abnormalities. (Id. at 284). Plaintiff's EEG was also normal. (Id. at 280).

Plaintiff followed up with Dr. Bowen on May 9, 2016. (Id.). He reported that he had been doing better but was still "getting episodes a couple times a week" and had experienced "[n]o seizures recently only auras." (Id. at 280, 282). Dr. Bowen's physical and neurological examinations of Plaintiff were normal. (Id. at 281-82). However, Dr. Bowen stated: "I have advocated that he apply for SSI as I do not think he is employable." (Id. at 282).

Plaintiff presented to the emergency department at Providence Hospital on June 16, 2016 and reported that he had experienced a grand mal tonic-clonic seizure that morning. (Id. at 312-13). The treatment records reflect that Plaintiff's baseline neurologic status and baseline functional capacity were normal. (Id. at 313). He was discharged the same day and directed to continue with his medications and follow up with his neurologist. (Id. at 314).

Nearly two months later, on August 8, 2016, Plaintiff was

seen again by physician assistant Clark at Singing River.  (Id. at 276).  He reported that his back pain and leg paresthesia had resolved with time.  (Id.).  It was noted that Plaintiff's twice-daily Lamictal dosage had been reduced from 200 to 150 milligrams since his last date of treatment, and that this had "really helped his balance and the [abnormal] eye movements he was experiencing." (Id.).  It was further noted that Plaintiff's last seizure was in June of 2016.  (Id. at 276, 278).  Plaintiff's physical and neurological examinations were normal, and he was advised to follow up in six months.  (Id. at 278-79).

On the same day, Dr. Bowen completed a seizure questionnaire. (Id. at 275).  He stated that Plaintiff suffered from epilepsy, which had been documented by EEG testing.  (Id.).  Dr. Bowen opined that Plaintiff would be expected to have partial complex seizures zero to five times during an average week, and zero to twenty times during an average month.  (Id.).  Dr. Bowen stated that Plaintiff sometimes lost consciousness during seizures.  (Id.).  He estimated that the length of the seizures was "1-2 minutes or may be brief" but that it would take "several hours" for Plaintiff to regain normal function after a seizure.  (Id.).  Dr. Bowen stated that Plaintiff's medication was effective in controlling his seizures, but that Plaintiff still had breakthrough seizures.  (Id.).  He further stated that the side effects of Plaintiff's medications were dizziness, unsteady gait, cognitive slowing, hypersomnolence,

headache, nausea, vomiting, mood disturbance, and sleep disturbance. (Id.). Dr. Bowen opined that the side effects would make Plaintiff unable to sustain normal concentration or pace in a work type setting, and that he did not expect Plaintiff's condition to improve. (Id.).

Plaintiff was next treated by physician assistant Clark at Singing River on May 31, 2017. (Id. at 301). Plaintiff reported "more episodes of staring over the past few months." (Id.). It was noted that these events primarily occurred during the day, and that they occurred "a few times a week and may occur several times in one day. This is brief and then he is back to baseline." (Id.). Physical and neurological examinations of Plaintiff again produced normal results, and he was advised to continue his current medication. (Id. at 302-03).

On December 9, 2017, Plaintiff presented to Providence Hospital's emergency department. (Id. at 330). There, Plaintiff's family reported that he had experienced a seizure two to three hours earlier that day that had lasted approximately three to four minutes. (Id.). They reported that, while Plaintiff had a history of seizures, they were "never this severe." (Id.). In the nursing assessment, it was documented that Plaintiff was alert and oriented, fully verbal, had clear speech, responded to commands, moved all extremities, had regular and unlabored breathing, had intact range of motion and no muscle weakness, and had a regular

pulse with no complaints of chest pain.  (Id. at 329-30).  Notes
from Plaintiff's physical examination reflect that he had
tachycardia, was drowsy, did not interact verbally, and had grossly
normal and symmetrical strength, normal breathing, and regular
heart rhythm.  (Id. at 330-31).  The attending physician noted:

> [Plaintiff's] "szs"[7] in [emergency department] were
> unusual in that [Plaintiff] would respond to [nurse]
> upon painful stimulus dur[i]ng sz and stopped global
> [tonic/clonic] activity off/on during my evaluation and
> quickly returned to being interactive verbally w/
> [nurse/radiology] staff[.]

(Id. at 331).  A CT scan of Plaintiff's head at the hospital
yielded normal results.  (Id. at 334, 337).  Plaintiff was given
Valium and discharged home, with instructions to follow up with
his neurologist within one or two days to increase his dosage of
Topamax.  (Id. at 334).

Thereafter, the record contains a second letter from Dr. Bowen
dated January 9, 2018.  (Id. at 338).  Dr. Bowen stated:

> [Plaintiff] is under my neurologic care for his seizure
> disorder.  His seizure disorder was stable for many
> years, but as is common with epilepsy, his seizures have
> increased in frequency over time and become more
> difficult to control.  Since 2015, despite the use of
> multiple antiepileptic drugs, his seizures have become
> unpredictable and intractable.  Though necessary, the
> use of multiple antiepileptic medications can affect his
> cognition as well as his balance.  The combination of
> the increased frequency and intractability of his
> seizures along with the use of multiple antiepileptic
> drugs has rendered [Plaintiff] unemployable.  Doing so

---

[7] The attending physician placed term "szs" (seizures) in quotation
marks.  (See Doc. 11 at 331).

may pose a risk to himself or others.  Please consider these factors in your decision.

(Id.).

At the request of the ALJ, psychologist Patsy H. Zakaras, Ph.D. conducted a comprehensive mental examination of Plaintiff on February 22, 2018.  (Id. at 340-42).  Dr. Zakaras administered the Wechsler Adult Intelligence Scale-IV ("WAIS-IV") and the Wide Range Achievement Test-IV.  (Id. at 341-42).  On the WAIS-IV, Plaintiff achieved a Verbal Comprehension score of 68, a Perceptual Reasoning score of 73, a Working Memory score of 82, a Processing Speed score of 79, and a Full Scale IQ score of 72.  (Id. at 341).  On the Wide Range Achievement Test-IV, Plaintiff's scores indicated that he was functioning on a fifth-grade level in reading and spelling and on a fourth-grade level in math.  (Id. at 341-42).  Dr. Zakaras' diagnostic impression was "[l]earning disorder, not otherwise specified."  (Id. at 342).

Based on her examination, Dr. Zakaras completed a form Medical Assessment of Ability to Do Work-Related Activities (Mental).  (Id. at 344-46).  In the form, Dr. Zakaras opined that Plaintiff had good ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, and maintain attention and concentration.  (Id. at 344-45).  She opined that Plaintiff had fair ability to understand, remember, and carry out complex job

instructions, but good ability to understand, remember, and carry out simple job instructions as well as detailed, but not complex, job instructions. (Id. at 346). Dr. Zakaras further opined that Plaintiff had good ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability, and that he was capable of managing benefits in his own best interest. (Id.).

As noted *supra*, Plaintiff contends that the ALJ erred in according little weight to the opinions expressed in Dr. Bowen's letters and seizure questionnaire. However, as explained below, the record reflects that the ALJ considered Dr. Bowen's letters and questionnaire, and substantial evidence supports his decision to accord them little weight. With respect to Dr. Bowen's letter dated September 14, 2015, the ALJ referenced the facts that Dr. Bowen did not see Plaintiff from 2013 until May 2015, that Plaintiff reported no seizure activity between his 2013 visit to Singing River and May 6, 2015, and that Dr. Bowen wrote the letter after treating Plaintiff only twice since May 7, 2015. (Id. at 22-23). The ALJ also noted that Dr. Bowen's support for "full lifetime disability" appeared to be premature, since the only treatments that had been tried for Plaintiff's seizures up to that

sabc

point were the medications Lamictal and Topamax.[8]  (Id. at 23);
see Harrison v. Comm'r of Soc. Sec., 569 F. App'x 874, 877 (11th
Cir. 2014) (per curiam) (finding that physician's prescription of
medications without recommending more aggressive treatment
suggested that claimant's impairments were not as severe as the
physician claimed).  Finally, the ALJ observed that on June 22,
2015, Plaintiff's last date of treatment with Dr. Bowen prior to
the letter, Plaintiff reported that his seizures were much better
since increasing his Lamictal and that he was feeling better
overall.  (Id.).

The Court agrees that each of the reasons given by the ALJ
for affording Dr. Bowen's opinions little weight are valid and
supported by substantial record evidence.  As the ALJ alluded to,
it strains credulity that Dr. Bowen could render this opinion after
only two dates of treatment[9] following a multi-year period in which
Plaintiff was taking seizure medication and was seizure-free, and
in the absence of any objective medical evidence of seizures.

It is noteworthy that, at the consultative examination just
two months after Dr. Bowen's letter, Plaintiff reported that he

---

[8] As the ALJ recognized, although Dr. Bowen's letter referred to
"multiple medication trials," the record reflects that Plaintiff
was only prescribed Lamictal and Topamax for his seizures.

[9] This is particularly true given that on the second of these two
dates, Plaintiff reported that his seizures were much better, and
he was better overall.  (See Doc. 11 at 289).

was stabilized, that Dr. Bowen had cleared him to drive, and that he had no restrictions. (Id. at 271). Furthermore, other than the statements of Plaintiff and his wife, there is absolutely no evidence from 2015 supporting Plaintiff's allegations of seizures, much less seizures frequent and severe enough to prevent employment. Plaintiff's neurological examinations around this time were uniformly normal. (Id. at 255, 257, 271-72, 287, 289-90, 293, 296). An EEG and a brain MRI ordered approximately five months after Dr. Bowen's letter showed no abnormalities. (Id. at 280, 284). Indeed, the record reflects that Plaintiff was working twelve-hour shifts just a few months after Dr. Bowen opined that he was unemployable. (Id. at 286). Moreover, the ALJ was not required to give any weight to Dr. Bowen's statements that he supported Plaintiff's disability claim and that Plaintiff was unemployable due to a combination of seizures and seizure medication side effects,[10] as those were not medical opinions but instead opinions on an ultimate issue reserved to the Commissioner. See 20 C.F.R. § 404.1527(d); Hernandez v. Soc. Sec. Admin., Comm'r, 761 F. App'x 901, 904 (11th Cir. 2019) (per curiam). Given the foregoing, the ALJ had ample cause to reject the opinions in Dr.

---

[10] Although Dr. Bowen cited side effects of antiseizure medications as a reason for Plaintiff's disability, the Court notes that Plaintiff was able to work full-time while taking the same medications prior alleged disability onset date. (See Doc. 11 at 257, 264-68).

Bowen's September 2015 letter.

The ALJ likewise had valid reasons for according little weight to the opinions in Dr. Bowen's seizure questionnaire. As the ALJ noted, the opinions in the seizure questionnaire were inconsistent with Dr. Bowen's own medical notes. (Id. at 23). The ALJ pointed out, for example, that while Dr. Bowen listed a number of medication side effects in the questionnaire, Plaintiff did not complain of any side effects during his appointments with Dr. Bowen or other medical providers. (Id.). The ALJ also noted that Dr. Bowen's opinions as to the frequency and effects of Plaintiff's seizures were unsupported by objective evidence, since Dr. Bowen had not actually witnessed any seizures and neurological testing and imaging studies were consistently normal. (Id.). The ALJ further noted the contradiction between Dr. Bowen's representation that Plaintiff had epilepsy which was documented by EEG testing, on the one hand, and Dr. Bowen's medical notes, on the other hand, which reflected that Plaintiff's EEG was normal. (Id.).

Substantial evidence supports the ALJ's decision to accord little weight to the opinions in Dr. Bowen's seizure questionnaire. First, the ALJ correctly noted that Dr. Bowen's opinions regarding the frequency, severity, and effects of Plaintiff's seizures appear to be wholly based on Plaintiff's subjective statements and are unsupported by objective evidence. Indeed, some of Dr. Bowen's opinions are contradicted by Plaintiff's own hearing testimony.

23

For example, Dr. Bowen opined that it would take several hours for Plaintiff to regain normal function after a seizure (id. at 275), but Plaintiff testified that it takes him about two minutes to recover from an episode and "[g]et back to the swing of things" (id. at 84), and that he does "[n]ot really" have any side effects after the "little small seizures[.]" (Id. at 90).

Second, although Dr. Bowen listed a number of side effects from Plaintiff's antiseizure medications, he did not actually state that Plaintiff experienced those side effects (see id. at 275), and Plaintiff's medical treatment records do not suggest that he suffered those side effects. For example, Dr. Bowen listed dizziness and unsteady gait as side effects of Plaintiff's medication (id.), but Dr. Cobb noted that Plaintiff ambulated with a normal gait (id. at 271), and Dr. Bowen's own examination records unvaryingly reflect that Plaintiff's gait was normal and his Romberg tests were negative. (See id. at 278, 282, 287, 290, 293, 296, 303, 320). Similarly, Dr. Bowen listed cognitive slowing as a side effect of the medication (id. at 275), but the cognitive examinations of Plaintiff at Singing River yielded entirely normal results, including intact comprehension and memory, 3/3 registration and recall, and normal fund of knowledge. (See id. at 278, 282, 287, 290, 293, 296, 303, 320). Moreover, Dr. Bowen's opinion that medication side effects would render Plaintiff unable to sustain normal concentration or pace in a work type setting is

24

belied by Plaintiff's demonstrated ability to work full-time on
those same medications prior to the alleged onset date and to work
at least part-time beyond 2015. Indeed, the record reflects that
Plaintiff left his employment voluntarily, and there is no evidence
suggesting that he was unable to sustain normal concentration or
pace at work based on side effects from antiseizure medications.

Third, Plaintiff's last date of treatment with Dr. Bowen prior
to the completion of the seizure questionnaire was on May 9, 2016.
(See id. at 280-83). During that visit, Plaintiff told Dr. Bowen
that he had been doing better, was having episodes only "a couple
times a week[,]" and had experienced "*[n]o seizures recently only
auras*." (Id. at 280, 282) (emphasis added). Remarkably, on August
8, 2016, the same day Dr. Bowen filled out the seizure
questionnaire, Plaintiff told the physician assistant at Singing
River that he had not had a seizure since *June* of that year. (Id.
at 276, 278). Given the obvious inconsistencies between Dr.
Bowen's opinions and Plaintiff's medical records, the ALJ
reasonably accorded little weight to the opinions in Dr. Bowen's
questionnaire.

Finally, the ALJ was justified in affording little weight to
Dr. Bowen's letter dated January 9, 2018. (See id. at 23-24). In
doing so, the ALJ reiterated that Dr. Bowen's opinions regarding
the severity of Plaintiff's seizure disorder were unsupported by
the evidence and appeared to be based solely on Plaintiff's

subjective reports.  (Id. at 23).  The ALJ further noted that there had been no changes in Plaintiff's medications or in the results of his examinations that would support Dr. Bowen's opinions that Plaintiff's seizures had worsened and become more difficult to control.  (Id. at 23-24).

Substantial evidence supports the ALJ's assignment of little weight to the opinions in Dr. Bowen's most recent letter.  First, Plaintiff's last appointment with Dr. Bowen on record was on *May 9, 2016*.  Since Dr. Bowen had not seen Plaintiff for more than a year-and-a-half prior to writing the second letter on his behalf, it appears that the letter was simply a restatement of Dr. Bowen's previously rendered opinions (which, as explained *supra*, were inconsistent with and unsupported by the medical evidence and other evidence of record), rather than a fresh opinion based on relevant new evidence.  Like his earlier letter and questionnaire, Dr. Bowen's most recent letter is undercut by the unremarkable results of Plaintiff's neurological examinations, the uniformly normal imaging studies, Dr. Bowen's consistent and conservative treatment of Plaintiff's seizures, and Plaintiff's activities.  As the ALJ pointed out, the *only* evidence of anyone outside of Plaintiff's family witnessing a seizure was at Providence Hospital on December 9, 2017.  Even then, the emergency room physician made it a point to put the word "szs" (seizures) in quotation marks and to note that Plaintiff's behavior during these ostensible seizures was

unusual.  (See id. at 331).[11]  And, while Dr. Bowen stated that that Plaintiff's antiepileptic medications "can affect his cognition as well as his balance[,]" he did not state that the medications actually *did* cause such impacts, and Plaintiff's progress notes from Singing River do not reflect the existence of such side effects.

Not only are Dr. Bowen's opinions concerning Plaintiff's inability to work unsupported by and inconsistent with his own medical records and those of his colleagues at Singing River, they are inconsistent with the findings of Plaintiff's other treating or examining doctors, which do not suggest that Plaintiff has physical or mental limitations that are not accommodated in the RFC.  In sum, the ALJ had many good reasons to reject the opinions of Dr. Bowen, and he provided reasonable explanations for his decisions to give Dr. Bowen's opinions little weight.  Accordingly,

---

[11] While acknowledging it was "not an opinion per se," the ALJ also considered Dr. Bowen's statement in his office notes that he had "advocated that [Plaintiff] apply for SSI as I do not think he is employable." (Doc. 11 at 23, 282).  The ALJ found the opinion to be inconsistent with the evidence, namely, Plaintiff's normal neurological examination that day, and gave it little weight. (Id. at 23).  The ALJ also noted, correctly, that the determination of whether an individual is disabled is an issue reserved to the Commissioner. (Id.); see 20 C.F.R. § 404.1527(d).  Plaintiff does not directly address the ALJ's findings regarding this statement in Dr. Bowen's treatment notes, and the Court finds no error in the ALJ's assessment of Dr. Bowen's statement.

Plaintiff's claim must fail.[12]

**VIII.      Conclusion**

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for a period of disability and disability insurance benefits be **AFFIRMED.**

**DONE** this **17th** day of **June, 2020.**

/s/ SONJA F. BIVINS
**UNITED STATES MAGISTRATE JUDGE**

---

[12] Although Plaintiff has cited evidence in the record which he claims supports a finding that he is disabled, that is, at best, a contention that the record evidence supports a different finding. That is not the standard on review.  The issue is not whether there is evidence in the record that would support a different finding, but whether the ALJ's finding is supported by substantial evidence. See Figueroa v. Comm'r of Soc. Sec., 2017 U.S. Dist. LEXIS 181734, at *15, 2017 WL 4992021, at *5 (M.D. Fla. Nov. 2, 2017) ("Although Plaintiff cites to certain test results, notes, and physical therapy findings as support for her contention that 'there were objective medical findings that support the doctor's opinions about [her] limitations', this is, at best, a contention that the record could support a different finding.  This is not the standard on review. The issue is not whether a different finding could be supported by substantial evidence, but whether this finding is.") (internal citation omitted).